# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ian H. Levin | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 3112 | **DATE** | 3/12/2004 |
| **CASE TITLE** | | Jill S. Janezich vs. Jo Anne B. Barnhart | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] **Enter memorandum opinion and order on plaintiff's motion for summary judgment. Plaintiff's motion for summary judgment is granted in so far as it requests a remand of the ALJ's decision [6-1]. The defendant's motion for summary judgment is denied. The case is hereby remanded to the Commissioner of Social Security for further proceedings consistent with this opinion. Judgment is entered pursuant to Rule 58 F. R. Civ. P.**

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | |
| | No notices required. | **3** number of notices | **Document Number** |
| ✓ | Notices mailed by judge's staff. | MAR 1 5 2004 | |
| | Notified counsel by telephone. | date docketed | |
| | Docketing to mail notices. | | **19** |
| | Mail AO 450 form. | 3/12/2004 | |
| | Copy to judge/magistrate judge. | date mailed notice | |
| SM | courtroom deputy's initials | U.S. DISTRICT COURT CLERK | SM mailing deputy initials |

Date/time received in central Clerk's Office

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| JILL S. JANEZICH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 03 C 3112 |
| | ) | |
| JO ANNE B. BARNHART, | ) | Magistrate Judge Ian H. Levin |
| Commissioner of the Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Jill Janezich ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of the Social Security Administration (the "SSA") denying her applications for Disability Insurance Benefits ("DIB") and Social Security Insurance ("SSI") under the Social Security Act (the "Act"). Before the Court are the parties cross-motions for summary judgment in the cause. For the reasons set forth below, the Court remands the cause for further proceedings consistent with this opinion.

## PROCEDURAL HISTORY

Plaintiff applied for DIB and SSI on October 14, 1999.[1] (R. 139-41, 373-75.) Plaintiff's

---

[1]In her initial applications, Plaintiff alleged she became disabled as of September 29, 1999 (the date she was diagnosed with breast cancer); however, she later amended her alleged onset date to February 14, 1999. (R. 43, 135, 139-41, 373-75.) Plaintiff sought benefits due to numerous complications arising from various surgeries for breast cancer treatment and breast reconstruction as well as fatigue, depression and anxiety. (R. 16, 17, 152-53.)

References are to the certified administrative record prepared by the Commissioner and filed with this Court pursuant to 42 U.S.C. § 405(g).

applications for benefits were initially denied and, denied again, upon reconsideration. (R. 68, 69, 74-77, 376-84.) Plaintiff then filed a timely request for an administrative hearing and, on August 15, 2001, Plaintiff appeared with counsel and testified at a hearing before an Administrative Law Judge ("ALJ"). (R. 36-62, 78, 385.) A vocational expert also testified at the hearing. (R. 62-66.)

On September 27, 2001, the ALJ issued his decision finding that Plaintiff was not disabled. (R. 15-21.) Plaintiff then filed a request for review of the ALJ's decision, and, on April 11, 2003, the Appeals Council denied Plaintiff's request for review making the ALJ's decision the final decision of the Commissioner. (R. 7-8.) Pursuant to 42 U.S.C. § 405(g), Plaintiff initiated this civil action for judicial review of the Commissioner's final decision.

## BACKGROUND FACTS

### I. MEDICAL EVIDENCE

On September 20, 1999, Plaintiff sought medical treatment for a lump she had found in her right breast. (R. 237.) At the time, Plaintiff reported to her physician, Dr. Gary Schaffel, M.D., that she had detected the lump approximately six to eight weeks prior to her visit. (R. 237.)

On September 23, 1999, Plaintiff underwent a biopsy[2] of the lump in her right breast. (R. 188.) The results of Plaintiff's biopsy indicated that she had infiltrating ductal carcinoma in her right breast. (R. 17, 194, 197-98.)

On October 21, 1999, Dr. Sonya M. Sharpless, M.D. (surgical oncologist) performed a right modified radical mastectomy[3] to remove the cancerous growth. (R.185.) Plaintiff's surgical wound

---

[2] A biopsy is the removal and examination of tissue to determine a precise diagnosis. *Dorland's Illustrated Medical Dictionary* (hereinafter "*Dorland's*"), 200 (28th ed. 1994).

[3] A modified radical mastectomy is a procedure where the breast tissue and lymph nodes
(continued...)

healed poorly and became infected. (R. 201, 205, 226-27.) Dr. Sharpless, subsequently, performed a debridement[4] procedure on the wound area and treated the wound with hydrogen peroxide (disinfectant cleansing liquid). (R. 226.)

On November 17, 1999, Plaintiff completed a fatigue questionnaire for the Bureau of Disability Determination Services ("DDS"). (R. 152-53.) Plaintiff reported that she first began having fatigue in December of 1998 from her cancer. (R. 152.) She indicated that she had undergone a mastectomy (in October of 1999) and had the energy to accomplish small tasks, a little at a time. (R. 152.) Plaintiff stated that she was almost always fatigued and any movement that put strain on her right side was difficult and tiresome. (R. 152.) Plaintiff reported that she could perform activities that lasted one half an hour at a time, twice a day (at the most) and that it took her three hours to recover from these activities. (R. 152.) She indicated that she is not able to do much due to her fatigue and takes a two hour nap most days, but would like to take three hour naps. (R. 152.) Plaintiff indicated on a typical day she took care of her fourteen month old daughter, made easy meals and did occasional laundry (i.e., she put the laundry in the washing machine, but she could not carry the laundry). (R. 153.) Furthermore, she stated that she could not lift, carry or hold her daughter due to the pain and strain on her right arm and that her activities were limited as a result of not having the full use of her right arm. (R. 153.)

_____

[3](...continued)
in the underarm are removed, but the underlying muscles are left intact. Robert Berkow *et al.*, *The Merck Manual of Medical Information – Home Edition* (hereinafter "*Merck Manual*"), 1104, (1st ed. 1997).

[4]Debridement entails the removal of foreign material and devitalized or contaminated tissue from or adjacent to a traumatic or infected lesion until surrounding healthy tissue is exposed. *Dorland's*, at 430.

On November 21, 1999, Dr. Sharpless completed a medical questionnaire for the DDS. (R. 201-04.) At that time, Dr. Sharpless reported that Plaintiff had a partially open wound that was healing poorly. (R. 201.) Dr. Sharpless opined that Plaintiff was limited in lifting, carrying and handling objects (less than fifteen pounds) with her right upper extremity (to avoid lymphedema).[5] (R. 201, 203.) Moreover, Dr. Sharpless indicated that Plaintiff's right armpit had skin numbness to her elbow and she would have long-term decreased sensation at her right armpit and right arm. (R. 202, 203.) However, Plaintiff's reflexes and strength were normal and there was no evidence of muscle spasms. (R. 202.) Plaintiff could also perform unlimited walking and could squat and rise from a sitting position. (R. 202.) Plaintiff's grip strength in her right and left hands was normal and she could perform fine and gross manipulation with both her hands. (R. 203.) Dr. Sharpless further opined that there was no evidence of metastasis or recurrence of the cancer; therefore, Plaintiff did not need to undergo chemotherapy or radiation therapy (treatments used to destroy cancer cells). (R. 201, 204.)

On November 22, 1999, Plaintiff saw Dr. Sharpless. (R. 227.) At that time, Dr. Sharpless's notes indicated that there was no discharge from Plaintiff's surgical wound. (R. 227.) Moreover, Plaintiff reported that she had no breast pain, fever or chills. (R. 227.) It was noted, however, that Plaintiff should be seen in two weeks, she should take Keflex (antibiotic) for ten days, and if the surgical wound became infected, she should contact Dr. Sharpless. (R. 227.)

On December 16, 1999, Plaintiff saw Dr. Sharpless again. (R. 227.) Plaintiff reported on that date that she had occasional right breast pain, but she had not had a fever or any chills. (R. 227.)

---

[5]Lymphedema is swelling caused by interference with the normal drainage of lymph (fluid found in the lymphatic vessels) back into the blood. *Merck Manual*, at 147.

Dr. Sharpless's notes further indicate that Plaintiff's wound site was well-healed with no drainage, her sutures were removed and her incision was cleaned. (R. 227.)

On February 7, 2000, Plaintiff saw Dr. Sharpless at which time she reported that she still had numbness in her right arm. (R. 225.) Dr. Sharpless noted that Plaintiff's incision was well-healed and she should see someone for right upper limb lymphedema. (R. 225.)

On March 9, 2000, Plaintiff saw Dr. Schaffel for an office visit.[6] (R. 309.)

On March 10, 2000, Dr. Sharpless completed a medical report for the SSA regarding Plaintiff's medical condition. (R. 205-08.) At that time, Dr. Sharpless reported that the incision in Plaintiff's right breast was well-healed and her infections had resolved. (R. 205, 206.) Plaintiff had no lymphedema in her right upper extremity; however, she had some tethering of skin at the axillary incision. (R. 206.) She also had decreased sensation to gross touch at the medial (middle) of her right arm. (R. 206.) Plaintiff further had good power and tone in all of her limbs and a fifteen to thirty degree limitation in all ranges of motion with respect to her right shoulder (post-operatively). (R. 206.) Dr. Sharpless indicated that Plaintiff had requested reconstructive surgery which would require a prolonged recuperation period, but was advised to quit smoking before this surgery was attempted. (R. 208.) Moreover, Plaintiff had been seeing a lymphedema counselor to avoid lymphedema and improve exercises with her right shoulder. (R. 208.) Dr. Sharpless, again, noted that Plaintiff did not need to undergo chemotherapy or radiation therapy. (R. 208.)

On March 21, 2000, Dr. Barry D. Free, M.D., a state agency physician, reviewed Plaintiff's medical record and completed a Physical Residual Functional Capacity Assessment form. (R. 211-18.) Dr. Free opined that Plaintiff could occasionally lift and/or carry twenty pounds, frequently lift

_____

[6]The notes from this visit, however, are illegible. (R. 309.)

and/or carry ten pounds, stand and/or walk six hours in an eight-hour workday; sit about six hours in an eight-hour workday; and had limited pushing and/or pulling in her upper extremities. (R. 212.) Dr. Free, however, indicated that Plaintiff had limited ability to lift, carry and reach (in all directions) with her right upper extremity. (R. 212, 214.) Dr. Free also noted (by checking the appropriate box on the form) that his opinion was consistent with Dr. Sharpless's opinion. (R. 217.)

On April 27, 2000, Daniella Wiegand, Psy.D. reported that Plaintiff underwent counseling from November 24, 1999 through January 6, 2000 for depression and anxiety related to her breast cancer and family problems. (R. 372.) Plaintiff's counseling was subsequently terminated following resolution of the family problems and a decrease in both her depression and anxiety. (R. 372.)

On May 2, 2000, Plaintiff saw Dr. Schaffel for an office visit.[7] (R. 308.)

On July 31, 2000, Plaintiff underwent a delayed right breast reconstruction with a TRAM (transverse rectus abdomini musculocutaneous) rotation flap (muscle taken from the lower abdomen to reconstruct the breast). (R. 241, 275-79.) Dr. Paul M. Steinwald, M.D., performed the surgery and reported that the surgery was complicated by partial loss of the lateral one-third of the skin and soft tissue flap. (R. 241, 275-79.) Plaintiff, however, had tolerated the surgical procedure well. (R. 279.)

On August 18, 2000, Plaintiff underwent a debridement procedure by Dr. Steinwald of necrotic skin and non-viable tissue following a complication of her breast reconstruction surgery.[8] (R. 272-74.) After the debridement procedure, Plaintiff was examined by Dr. Steinwald on a daily

---

[7]The notes from this visit, however, are illegible. (R. 308.)

[8]Prior to her breast reconstruction surgery, Plaintiff had been advised that her heavy smoking might put her at a higher risk for partial or complete flap ischemia or necrosis, but she indicated that she had not smoked in the month prior to the surgery. (R. 275.)

basis for approximately two weeks. (R. 299-303.) She was also visited at home twice each day for almost two months by a nurse who dressed her surgical wound and monitored it for infection. (R. 49, 296.) During this period, Plaintiff was treated by Dr. Steinwald for pseudomonas colonization (infection) and after the wound healed Plaintiff had a sizable contour deformity of her right breast. (R. 49, 241.)

On September 21, 2000, Plaintiff saw Dr. Steinwald. (R. 296.) At that time, Plaintiff reported that the drainage from her wound was decreasing. (R. 296.) Dr. Steinwald noted that Plaintiff had new complaints of feeling "warm" the day before and lethargic. (R. 296.) Dr. Steinwald further noted that the fact that Plaintiff was a vegetarian could cause her feelings of lethargy. (R. 296.) Dr. Steinwald indicated that Plaintiff continued to progress nicely, but noted that she needed nutritional supplements. (R. 296.)

On October 9, 2000, Plaintiff saw Dr. Sharpless for a follow-up visit. (R. 232.) At that time, Dr. Sharpless noted that Plaintiff was healing slowly at the TRAM site, but her pain was dissipating. (R. 232.) Moreover, Dr. Sharpless noted that Plaintiff had some fatigue, but her appetite was good. (R. 232.)

On October 30, 2000, Plaintiff saw Dr. Steinwald. (R. 294.) At that time, Plaintiff reported she was feeling generally feeling well and she had no new complaints. (R. 294.)

In October of 2000, Plaintiff underwent a psychological evaluation with Christine Rice, Ph.D. at the Lake County Health Department and Community Health Center. (R. 242-51.) At the time, Plaintiff reported that her main problem was dealing with her anger at her family which had always been emotionally abusive. (R. 242.) Plaintiff indicated that she felt guilty most of the time which she believed was probably due to the way she was raised and her family history. (R. 246.) She

7

stated her sleep was within normal limits, but that her baby sometimes interfered with her sleep. (R. 247.) Plaintiff further indicated that she was able to care for herself which included bathing, dressing, preparing meals, cleaning and shopping. (R. 247.) Plaintiff reported that she had friends, but recently she had become more introverted and tired. (R. 247.) During the evaluation, Dr. Rice noted that Plaintiff's behavior was appropriate, her concentration was good, and she was oriented to time, person and place. (R. 245-46.) Dr. Rice diagnosed Plaintiff with an Adjustment Disorder NOS (i.e., not otherwise specified) and Personality Disorder NOS (i.e., not otherwise specified) and determined she had a global assessment of functioning ("GAF") score of 55.[9] (R. 250.) Plaintiff's initial treatment plan for these disorders included individual therapy and counseling. (R. 250.) Furthermore, at that time, Dr. Rice noted that Plaintiff did not need to undergo any additional testing and/or assessments (e.g., psychiatric evaluation and functional and/or vocational assessments) related to her disorders.[10] (R. 251.)

On November 6, 2000, Dr. Steinwald performed another surgery to augment and revise Plaintiff's right breast reconstruction surgery. (R. 241, 268-71.) Plaintiff tolerated the surgical procedure well and, as of November 17, 2000, Dr. Steinwald reported that she had an excellent post-operative result. (R. 241, 271.) In addition, Dr. Steinwald indicated, on that same date, that while

---

[9]GAF measures an individual's overall level of psychological, social, and occupational functioning. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 32 (rev. 4th ed. 2000). A GAF score of 51 to 60 is intended to identify an individual with "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Id.* at 34.

[10]Based on the administrative record, Plaintiff underwent counseling from October of 2000 through approximately April of 2001. (R. 242-61.) However, Plaintiff's attorney reported in July of 2001 that Plaintiff's counseling was ongoing. (R. 135.)

8

Plaintiff no longer needed daily nursing care, she was still in the convalescent phase from the second reconstructive procedure and estimated she would need four to six weeks to recover before she could undergo work-oriented activities, assuming that there were no further post-operative complications. (R. 241, 271.) Thus, although the wound from the November 6, 2000 surgery healed well, a superior inset scar depression remained and additional surgery to complete the reconstruction was needed. (R. 263.)

On November 21, 2000, Plaintiff saw Dr. Steinwald at which time she was doing well overall and had no new problems to report. (R. 291.) Dr. Steinwald noted that Plaintiff's right breast was healing well and she had a smaller recurrent area drained. (R. 291.) Moreover, Dr. Steinwald's notes indicate that Plaintiff's flap was viable and healing well. (R. 291.)

On January 2, 2001, Plaintiff saw Dr. Steinwald and reported she had no new complaints, but she was feeling tired in general. (R. 288.) Dr. Steinwald indicated that Plaintiff had improved overall since her last visit, on December 22, 2000, where he noted that she had a mild wound infection which was resolving. (R. 289.)

On February 21, 2001, Dr. Steinwald performed the final reconstructive surgery on Plaintiff's right breast. (R. 263-67.) Plaintiff's surgery entailed *inter alia* revising the superior inset scar on her right breast and performing a nipple reconstruction. (R. 263-67.) Dr. Steinwald indicated that Plaintiff tolerated the procedure well and was returned to the recovery room in good condition. (R. 267.)

On April 3, 2001, Plaintiff saw Dr. Steinwald and reported she was feeling good overall and had no new problems. (R. 286.) Dr. Steinwald noted that Plaintiff could return to work and normal activities within one to two months. (R. 286.)

On April 16, 2001, Dr. Sharpless opined that Plaintiff has certain "lifting restrictions for the rest of her life." (R. 280.) Thus, Plaintiff is permanently precluded from repetitively lifting more than fifteen pounds with her right arm, carrying any weight on her right shoulder, and performing abdominal lifting of thirty to fifty pounds (to prevent herniation). (R. 280.)

On May 14, 2001, Plaintiff saw Dr. Steinwald and reported that although she had been feeling good during the past month, she had also been lethargic. (R. 285.) Dr. Steinwald noted that Plaintiff was doing well and that social services had requested progress notes regarding Plaintiff's condition. (R. 285.)

On June 1, 2001, Dr. Sharpless responded to a medical questionnaire from Plaintiff's attorney. (R. 282.) Dr. Sharpless opined that Plaintiff's symptoms of fatigue and low energy after minimal activity were reasonably related to her medical impairment(s). (R. 282.) Specifically, Dr. Sharpless explained Plaintiff would have required six to eight weeks to fully recover from her initial as well as her follow-up surgeries (if there were no complications). (R. 282.) However, repetitive surgeries and infection would progressively wear down the body which would require a longer recovery period. (R. 282.) Dr. Sharpless opined that Plaintiff's symptoms would likely continue another two to three months, but also noted that her fatigue and energy loss would improve day-by-day and would be helped by exercise, cessation of smoking, a positive attitude, and a nutritious diet. (R. 282.)

On September 30, 2001, Dr. Steinwald completed a medical questionnaire for Plaintiff's attorney. (R. 370-71.) Dr. Steinwald opined that Plaintiff's allegations of fatigue could not reasonably be related to her medical impairment(s) and surgical procedures. (R. 371.) He further indicated that Plaintiff had a difficult time healing from the various surgical procedures (e.g., due

to infections) and had required the following periods of convalescence: (1) six weeks for the July 31, 2000 reconstructive surgery; (2) ten weeks for the August 18, 2000 debridement procedure; (3) six weeks for the November 6, 2000 reconstructive surgery; and (4) four weeks for the February 21, 2001 reconstructive surgery. (R. 370.) Moreover, Dr. Steinwald opined that Plaintiff's impairments were equivalent to Listing 1.13.[11] (R. 371.) *See* 20 C.F.R. Pt. 404, Subpt. P, App.1.

## II.  PLAINTIFF'S BACKGROUND/TESTIMONY

Plaintiff was born on December 17, 1960 and was forty-one years old at the time of the administrative hearing. (R. 37.) Plaintiff completed high school and worked as a waitress, apartment manager, and home care worker. (R. 38-42.) Plaintiff lived with her father and two year old daughter. (R. 38.)

At the administrative hearing, Plaintiff testified that, on September 29, 1999, she was diagnosed with breast cancer. (R. 42-43.) At that time, Plaintiff indicated she felt exhausted, very weak and dizzy, to the point where she felt like she could pass out. (R. 43.) She stated that in August of 1999, she woke up one day and her whole right arm and side were sore. (R. 43-44.) Plaintiff testified that she first began to notice these symptoms around Thanksgiving of 1998, about two months after her daughter was born. (R. 44.) She indicated that she continued to work as a waitress in New Mexico through January of 1999 until she felt so tired that she could no longer work and care for her daughter. (R. 38-39, 44-45.) Plaintiff testified that, at that point, she decided to move home to live with her father in North Chicago, Illinois in February of 1999. (R. 38, 44-45.) She further

---

[11]Listing 1.13 states: "*Soft tissue injuries of an upper or lower extremity* requiring a series of stated surgical procedures within 12 months after onset for salvage and/or restoration of major function of the extremity, and such major function was not restored or expected to be restored within 12 months after onset." 20 C.F.R. Pt. 404, Subpt. P, App.1.

stated that she intended to work after she moved home to live with her father, but she was too exhausted and weak to do so. (R. 45.) Moreover, she indicated that it was difficult for her to take care of her daughter so her father helped her. (R. 45.)

Plaintiff testified that in October of 1999 she underwent a mastectomy. (R. 45.) She stated that after the mastectomy, she felt worn out and depressed, as if she was going through a grieving process (i.e., her body was grieving its loss) and like she "fell into a black hole" which lasted for a few months. (R. 46-47.) Plaintiff further indicated that after her mastectomy her father helped her care for her daughter because she could not lift her arm since her lymph node had been removed. (R. 56-57.) She testified that it was approximately two and a half months after the surgery before she could begin doing standard things for her daughter; such as, diaper changing.[12] (R. 56-57.)

Plaintiff indicated that in July of 2000 she started to feel normal again and then she had her initial reconstructive surgery. (R. 47.) She testified that she did not feel well following her initial reconstructive surgery (but she could not really remember) and that her body tissue was dying after the surgery. (R. 47.) Plaintiff stated she had complications from her initial reconstructive surgery and needed a debridement procedure a few weeks later. (R. 47-48.) After the initial reconstructive surgery, however, she indicated that she could occasionally go grocery shopping and do laundry. (R. 48.)

Plaintiff testified that after the debridement procedure, she did not regain her strength or energy and she felt the most sick during all of her surgeries because she "had big holes in [her] body that needed to be patched" and she "kept getting pseudomonas . . . , which is an infection, . . . that

---

[12]Plaintiff testified that following her surgeries, "[t]here were periods where [she] didn't really do much." (R. 57.)

"kept coming back." (R. 49.) She stated that she kept taking antibiotics and the pseudomonas was really tough to fight. (R. 49.) During this period, Plaintiff indicated that a nurse came twice each day to her house to "pack my holes . . . with bleach" to deal with her pseudomonas infection. (R. 49.) She further testified that the nurse came to her house on a daily basis for almost three months. (R. 49.)

Plaintiff testified that, in November of 2000, she underwent another surgery to augment and revise her breast reconstruction. (R. 49-50, 241.) After her November 2000 surgery, Plaintiff stated that she was hospitalized for two and one-half days. (R. 50.) She indicated that after this surgery, she felt worn out and she felt like her body kept getting traumatized from the surgeries and she really never had a break from the surgeries. (R. 51.)

In February of 2001, Plaintiff stated that she underwent her final reconstructive surgery. (R. 50-51, 263-67.) After this surgery, she testified she was also hospitalized for two and a half days. (R. 50.) Plaintiff indicated that since her surgery in February of 2001, she began feeling better in July of 2001 and was beginning to feel like "a human being again." (R. 51.) She stated that she was slowly beginning to be able to do more things, but she still gets "really worn out." (R. 51.) Plaintiff testified that she could do more activities with her daughter, such as going to the beach a few times, but she needed to take a nap two days in a row after they had gone to the beach. (R. 51-52.) She stated that she needed to take naps three to four times a week for approximately an hour and a half. (R. 52.) Moreover, Plaintiff indicated that during her series of surgeries, she went long periods of time not speaking to anyone (R. 47) and did not go out socially.[13] (R. 54.)

---

[13]Plaintiff testified that her social life entailed talking to her friends on the telephone. (R. 54.)

At the time of the hearing, on August 15, 2001, Plaintiff testified that she did laundry and grocery shopping about once a week (sometimes twice a week), had no difficulty driving a car, and cooked meals. (R. 52-53.) When the ALJ questioned her about her activities, particularly those with her daughter, such as going to the park, she stated she and her daughter did not go to the park that much because "it's a lot of energy for [her]." (R. 57-58.) In addition, when the ALJ questioned Plaintiff regarding her fatigue, she stated she had talked to Drs. Sharpless and Steinwald about it "all the time." (R. 58.) Plaintiff indicated that she had last seen Dr. Sharpless in June (2001) for her six month check-up. (R. 58-59.) She further testified that she waited until July of 2000 to have her breast reconstruction surgery because her insurance company would only pay the second surgeon a nominal fee. (R. 59.) Thus, Dr. Steinwald told her that if she would wait, his son would be done with school and they would do the surgery together and she would not have to worry about the second surgeon fee. (R. 59.)

## III.   VOCATIONAL EXPERT'S TESTIMONY

Mr. Frank Mendrick, a vocational expert, testified at the administrative hearing. (R. 62-66.) Mr. Mendrick classified Plaintiff's past work as a waitress/server at the light and medium exertional levels and as semi-skilled work. (R. 63.) Mr. Mendrick further classified Plaintiff's work as a home care worker at the medium exertional level and as unskilled work and her work as an apartment manager at the light and medium exertional levels and as semi-skilled work. (R. 63.)

The ALJ asked Mr. Mendrick to assume a hypothetical person of Plaintiff's age, education and work experience who could lift up to fifteen pounds occasionally and ten pounds occasionally; could sit, stand or walk as required; could not perform repetitive overhead reaching, pushing or pulling activities with her right dominant upper extremity; and could not perform activities requiring

14

full extension of the right upper extremity. (R. 63.) The ALJ then asked Mr. Mendrick whether there was any work that such a hypothetical person could perform. (R. 63.) In response, Mr. Mendrick testified that such a person could perform sedentary, unskilled general assembly work (i.e., bench work) (3,000 jobs), inspection and testing work (1,000 jobs), and feeder work for packaging machines or hand molding machines (1,200 jobs) that are available in the six county Chicago metropolitan area, plus Porter and Lake counties in Indiana. (R. 64-65.) Mr. Mendrick stated that these types of jobs required the work to be performed based on an individual working fifty minutes out of an hour and an individual who could not maintain this pace (i.e., due to fatigue) would be impaired in the ability to perform the work. (R. 65.) Moreover, Mr. Mendrick testified that none of these jobs would allow an individual, during the work day, to nap three to four times a week for one to two hours at a time. (R. 65.)

Mr. Mendrick further stated that if an individual had to convalesce for thirty-two weeks during an eighteen month period, the individual would not be able to sustain work activity during that period. (R. 65.) Mr. Mendrick provided the following testimony:

> Q.: And over an 18 month period of time, if a person had to convalesce for a period of 32 weeks, would they be able to sustain work activity during that time?
>
> A.: Not without a special program. For that amount of time off for illness, no. (R. 65.)

In addition, Mr. Mendrick stated that if an individual needed to nap only twice a week for an hour and a half, that still would not be acceptable to sustain the jobs he had recited. (R. 65-66.)

## IV.   THE ALJ'S FINDINGS AND DECISION HEREIN

The ALJ determined that Plaintiff has not engaged in any substantial gainful activity since

the alleged onset date of her disabling condition. (R. 16, 20.) The medical evidence establishes that Plaintiff has significant limitations in her ability to perform basic work activities as a result of her medically determinable impairments (i.e., complications arising from various surgeries for breast cancer treatment and breast reconstruction); consequently, her impairments are severe. (R.17, 20.)

The ALJ found that Plaintiff did not have an impairment or combination of impairments listed in, or medically equal to one listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, Regulation No. 4. (R. 20.) Because the ALJ determined that Plaintiff's impairments did not meet or equal a listed impairment, the ALJ assessed Plaintiff's RFC to determine what he could do despite his limitations. (R. 20.)

The ALJ concluded that Plaintiff has the RFC to perform a limited range of light work; however, she was precluded from work-related activities that (1) involved lifting more than fifteen pound occasionally or ten pounds frequently; (2) repetitive overhead reaching and/or pushing and pulling activities with her dominant right upper extremity (even on an occasional basis); and (3) required full extension of her right upper extremity. (R. 20.) Moreover, the ALJ found that Plaintiff was unable to perform any of her past relevant work and had no transferable skills from any past relevant work to occupations within her RFC. (R. 20-21.)

The ALJ found, using the Medical-Vocational Guidelines, Rule 202.21, as a framework, which was supplemented by the vocational expert's testimony, that Plaintiff could perform a significant number of jobs in the national economy (within the six-county Chicago metropolitan area plus Lake and Porter counties in Indiana); including general assembly work (3,000 jobs); inspection and testing work (1,000 jobs); and feeder work for packaging machines or hand molding machines (1,200 jobs). (R. 21, 64.) *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2.

The ALJ further found that Plaintiff's allegations regarding her limitations were not fully credible. (R. 20.)

Accordingly, the ALJ determined that Plaintiff was not disabled under the terms of the Act. (R. 21.)

**LEGAL STANDARDS**

## I.      STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is limited. The Act at 42 U.S.C. § 405(g) establishes that the Commissioner's findings as to any fact are conclusive if they are supported by substantial evidence. *See also Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Pearles*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971); *Brewer*, 103 F.3d at 1390. The court may not reevaluate the facts, reweigh the evidence, or substitute its own judgment for that of the Commissioner. *See Brewer*, 103 F.3d at 1390. Conclusions of law, however, are not entitled to deference. Thus, if the Commissioner commits an error of law, reversal is required without regard to the volume of evidence in support of the factual findings. *See Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

## II.     STATUTORY AND REGULATORY FRAMEWORK

To receive disability benefits, SSI and DIB claimants must be "disabled" as defined by the Act. *See* 42 U.S.C. § 423(a)(1)(D); 42 U.S.C. § 1382(a); *Pope v. Shalala*, 998 F.2d 473, 477 (7th Cir. 1993). An individual is "disabled" if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than

17

12 months." *See* 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505(a). *See also Jones v. Shalala*, 10 F.3d 522, 523-24 (7th Cir. 1993). To satisfy this definition, an individual must have a severe impairment that renders her unable to do her previous work or any other substantial gainful activity that exists in the national economy. *See* 20 C.F.R. § 404.1505(a).

The Social Security regulations delineate a five-step process for determining whether a claimant is disabled within the meaning of the Act. *See* 20 C.F.R. § 404.1520. The ALJ first considers whether the claimant is presently employed or "engaged in substantial gainful activity." 20 C.F.R. § 404.1520(b). If she is, the claimant is not disabled and the evaluation process is over; if she is not, the ALJ next addresses whether the claimant has a severe impairment or combination of impairments which "significantly limits . . . physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). Third, the ALJ determines whether that severe impairment meets any of the impairments listed in the regulations. 20 C.F.R. Pt. 404, Subpt. P, App.1. If it does, then the impairment is acknowledged by the Commissioner to be conclusively disabling. *See Brewer*, 103 F.3d at 1391.

If the impairment does not so limit the claimant's remaining capabilities, the fourth step is that the ALJ reviews the claimant's RFC and the physical and mental demands of her past work. RFC is a measure of what an individual can do despite the limitations imposed by her impairments. *See* 20 C.F.R. §§ 404.1545(a), 416.945(a). *See also* Social Security Ruling 96-8p (1996). If the claimant can perform her past relevant work, she will be found not disabled. *See* 20 C.F.R. § 404.1520(e).

For the fifth step, if the claimant shows that her impairment is so severe that she is unable to engage in her past relevant work, then the burden of proof shifts to the Commissioner to establish

18

that the claimant -- in light of her age, education, job experience and functional capacity to work -- is capable of performing other work and that such work exists in the national economy. *See* 42 U.S.C. § 423(d)(2); 20 C.F.R. § 404.1520(f). *See also Brewer*, 103 F.3d at 1391.

## ANALYSIS

Plaintiff seeks reversal of one portion, and remand of another portion, of the ALJ's decision finding that she is not disabled.

Regarding reversal, Plaintiff avers that she is entitled to a closed period of disability because, as the vocational expert's testimony establishes, she would have been unable to sustain work activity during the eighteen-month period (i.e., September 23, 1999 through March 21, 2001) during which time she underwent her six surgeries or surgical procedures (including her initial biopsy) for breast cancer and breast reconstruction.[14] (Pl.'s Mem. at 11-12; Pl.'s Reply at 1-3.) Defendant, on the other hand, asserts that Plaintiff retained the RFC to perform a limited range of light work despite her impairments. (Def.'s Mem. at 8-14.)

With respect to Plaintiff's assertion that she should be awarded benefits for a closed period of disability, the Court initially notes that the record conclusively establishes that Plaintiff would have been unable to work for a substantial period of time during the eighteen-month time period that she underwent her six surgeries or surgical procedures for breast cancer and breast reconstruction. For example, as established by the record, Dr. Sharpless reported that Plaintiff would have required six to eight weeks to fully recover from her initial October 21, 1999 surgery (i.e., right modified

---

[14]The Defendant argues, too, that a remand is necessary (for the pre-September 20, 1999 and post-March 31, 2000 period) as the ALJ's decision lacks the specificity to permit a fair determination as to whether Plaintiff's condition was disabling for a continuous period of twelve months.

radical mastectomy). (R. 282.) Dr. Steinwald further reported that Plaintiff, who had had a difficult time healing from the various surgical procedures (e.g., due to infections), required the following periods of convalescence after her reconstructive surgeries: (1) six weeks for the July 31, 2000 reconstructive surgery; (2) ten weeks for the August 18, 2000 debridement procedure; (3) six weeks for the November 6, 2000 reconstructive surgery; and (4) four weeks for the February 21, 2001 reconstructive surgery. (R. 370.)

Next, the Court notes that the vocational expert, Mr. Mendrick, testified that if an individual had to convalesce due to illness for thirty-two of the weeks during an eighteen-month period, that individual would not be able to sustain work activity during that period. Specifically, Mr. Mendrick testified as follows at the administrative hearing:

> Q.: And over an 18 month period of time, if a person had to convalesce for a period of 32 weeks, would they be able to sustain work activity during that time?
>
> A.: Not without a special program.[15] For that amount of time off for illness, no. (R. 65.)

Strikingly, the ALJ never mentions or addresses in his decision the above-recited testimony of the vocational expert, Mr. Mendrick.[16]

The Court also notes that although the ALJ in his decision states that "[Plaintiff's] surgeries increased her level of debility for a period of time," the ALJ's threshold conclusion as to residual functional capacity was that "considering the whole period, [Plaintiff's] condition was not disabling

---

[15]There's no evidence in the record that there was any type of special program that Plaintiff could perform.

[16]The Defendant does not mention or discuss the above-recited testimony of Mr. Mendrick in its response herein.

for a continuous period of 12 months." (R. 17.) *See* 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. §

404.1505(a). However, *see e.g. Dix v. Sullivan*, 900 F.2d 135, 138 (8th Cir. 1990)(*quoting Singletary*

*v. Bowen*, 798 F.2d 818, 822 (5th Cir. 1986)("A finding that a claimant is able to engage in

substantial gainful activity requires more than a simple determination that the claimant can find

employment and that he can physically perform certain jobs; it also requires a determination that the

claimant can *hold* whatever job he finds for a significant period of time.")(emphasis in original);

*SSR* 96-8p("RFC is an assessment of an individual's ability to do sustained work-related physical

and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing

basis' means 8 hours a day, for 5 days a week, or and equivalent work schedule.") *SSR 96-8p, 1996*

WL 374184 at *1 (S.S.A. 1996).

Given the vocational expert's testimony quoted above, the ALJ's finding that the Plaintiff

was not disabled for the seventeen or eighteen-month period concerned[17] cannot be affirmed. On

the other hand, considering the quoted vocational expert testimony[18], but given Plaintiff's surgical

dates and the record evidence of the convalescent period for each of the five surgeries or surgical

procedures, the Court is unable to meaningfully and fairly determine whether the Plaintiff's

condition was disabling for a continuous period of twelve months. Accordingly, an outright reversal

for an award of benefits is not warranted.

In view of the foregoing, the cause must be remanded for further hearing as to the subject

closed seventeen or eighteen-month closed disability period concerned. *See Connor v. Shalala*, 900

---

[17]The time period commences from either September 23, 1999 or October 21, 1999.

[18]When one considers the time between the July 31 and August 18 surgeries instead of the
convalescent time given for the July 31 surgery, the total convalescent time is twenty-eight and
one-half to thirty and one-half weeks rather than thirty-two weeks.

F.Supp. 994, 1003-04 (N.D. Ill. 1995). Specifically, the hearing should include the calling as a witness of the vocational expert, Mr. Mendrick. Mr. Mendrick should, at a minimum, be asked, specific, appropriate follow-up questions, given the Plaintiff's five surgical dates and the convalescence period for each surgery, relevant to the twelve-month continuous period of disability period issue.[19] The ALJ should, then, determine if the Plaintiff was disabled or not for a continuous period of twelve months. If a finding of disability is made, the ALJ should specify the exact period of disability, setting forth his reasons therefor. If the ALJ finds the Plaintiff not disabled, the ALJ's decision should make appropriate findings of fact and specify the rationale for his determination.[20]

## CONCLUSION[21]

Accordingly, the Court grants Plaintiff's Motion for Summary Judgment insofar as it requests a remand and denies Defendant's Motion for Summary Judgment. Accordingly, the cause is remanded, pursuant to sentence four of 42 U.S.C. § 405, to the Commissioner for further proceedings consistent with this opinion.

---

[19]If Mr. Mendrick is not still available, a new vocational expert should be called to testify.

[20]For the periods of time from January 1999 through August 1999 and April 2001 through the present, the Court finds that substantial evidence exists to support the ALJ's determination and/or no medical evidence exists to support the Plaintiff's position.

[21]In view of the Court's ruling herein, it is deemed unnecessary to consider Plaintiff's and Defendant's other arguments raised herein.

ENTER:

IAN H. LEVIN
U.S. Magistrate Judge

Dated:  March 12, 2004